IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Boykin K. Bell, | ) | C/A No.: 3:15-4334-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Alion Science and Technology | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this employment discrimination case, Boykin K. Bell ("Plaintiff") sues his former employer, Alion Science and Technology Corporation ("Defendant"). Plaintiff filed his complaint in the Sumter County Court of Common Pleas on August 17, 2015 [ECF No. 1-1 at 4], and filed an amended complaint ("Complaint") on September 23, 2015 [ECF No 1-1 at 11]. Defendant timely removed the case on October 23, 2015. [ECF No. 1]. In the Complaint, Plaintiff alleges the following causes of action: (1) failure to accommodate and wrongful discharge in violation of the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.*, as amended ("ADA"); (2) violation of the Family and Medical Leave Act, 29 U.S.C. §2601, *et seq.* ("FMLA"); and (3) breach of contract. [ECF No. 1-1 at 11–17]. This matter comes before the court on Defendant's motion for summary judgment. [ECF No. 16]. This matter having been fully briefed [ECF Nos. 17, 19], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.).

Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district judge grant in part and deny in part Defendant's motion for summary judgment.

I.     Factual Background

Plaintiff is a type-II diabetic and was initially diagnosed in 2004 or 2005. Pl. Dep. 20:9–12.[1] Plaintiff takes medication for his type-II diabetes. *Id*. at 23:9–19. He has never been hospitalized or visited an emergency room related to his diabetes. *Id.* at 77:23–78:2. Once he was diagnosed, his physician prescribed medication that alleviated his symptoms. *Id.* at 78:3–15.

Plaintiff is a career journalist and professional writer. *Id*. at 29:24–33:15. Defendant is a government contractor formerly assigned to document and write the history of the United States Air Forces Central Command ("AFCENT") headquartered at Shaw Air Force Base in Sumter, South Carolina. *Id*. at 33:24–34:15. Despite Plaintiff having had no prior military experience, Defendant hired him as a military analyst in early 2009 working with its "History Team." Pl. Aff. ¶¶ 1–2.[2] As a military analyst, *inter alia*, Plaintiff worked "under the direct supervision of a project, program, and/or division manager, or more senior analyst, and within the scope of work derived from a contract with a government customer . . . ." [ECF No. 16-3 at 2].

_____

[1]Plaintiff's deposition may be found at ECF Nos. 16-2, 17-18, and 17-19.
[2]Plaintiff's affidavit may be found at ECF No. 17-1 at 1–7 (original) and 8–11 (supplemental).

Initially, Bob Flury was Plaintiff's direct supervisor. Pl. Dep. 40:2–4. In 2011, Project Lead and Senior Military Analyst Michael Gartland became Plaintiff's direct supervisor. *Id.* at 40:7–19. Gartland reported to Project Manager Joseph Waldron. *Id.* Waldron reported to Program Manager Hugh Cameron, who was Defendant's liaison with AFCENT. *Id.* Plaintiff and others referred to a Department of Defense employee named Kathi Jones as Defendant's customer. *Id.* at 35:6–9, 41:9–13.

Plaintiff's responsibilities included "assuring quality control throughout all contract activities" and demonstrating "superior writing and presentation skills to develop briefings, documents, papers, conceptual, and analytical reports for clients." [ECF No. 16-3 at 3]. The main job of the History Team was to complete a classified annual written report recording information received from the field, including the AFCENT periodic history using documents from numerous sources. Jones Aff. ¶ 2.[3] The periodic history was "a combined effort" of Gartland, John Harrill, and Plaintiff. *Id.* at 1, 4; Pl. Aff. ¶ 2; Pl. Dep. 152:2–7. The authors of the specific portions of a final document were not identified or identifiable. *Id.*

Plaintiff was evaluated every fiscal year, which ran October 1 through September 30. [ECF Nos. 17-6 to 17-10]. Under Flury, Plaintiff's evaluations in 2009 were "exceeds expectations" and in 2010 were "fully satisfactory" on the five categories ratings listed and overall. [ECF Nos. 17-6, 17-7].

However, Plaintiff did not fare as well under Garland. Garland rated Plaintiff in his 2011 evaluation with two "needs improvement," two "fully satisfactory," and one

---

[3] Jones' affidavit is available at ECF No. 17-5.

"exceeds expectations," with an overall rating of "needs improvement." [ECF No. 17-8 at 2–5].[4] On October 25, 2011, Plaintiff was placed on a 90-day performance improvement plan ("PIP"). [ECF No. 16-3 at 17–18; Pl. Dep. 130:22–133:12]. Plaintiff claims Garland told him his writing "lacked analysis." Pl. Aff. ¶ 4. Having had no military experience, Plaintiff subsequently learned from Gartland there were classified sources he could and should have been using in his writing, and he began using those sources. Pl. Dep. 133:24–137:1. On January 25, 2012, Plaintiff's PIP was extended for another 90 days.[5] Pl. Dep. 137:16–138:1.

After Plaintiff completed his continued PIP in April 2012, Garland states that he found Plaintiff's "overall performance continued to be sub-standard." Gartland Decl. ¶ 8.[6] Nevertheless, Garland rated Plaintiff in his 2012 evaluation with three "fully satisfactory" and two "exceeds expectations," with an overall rating of "fully satisfactory." ECF No. 17-9 at 2–5 (2012 evaluation).[7]

Harrill provided affidavit and deposition testimony that during this time, Gartland would belittle Plaintiff related to his diabetes. Harrill Nov. Aff. ¶ 2; Harrill Dep. at 52:3–20.[8] Specifically, he would joke that a person going to the restroom after Plaintiff needed to watch for a sticky floor because of spilling sugary urine. *Id.* Plaintiff's doctor wrote

[4] The 2011 evaluation Defendant submitted appears to be missing pages 3 and 4.

[5] In its memorandum [ECF No. 16-1 at ¶ 8], Defendant references the continued PIP dated January 25, 2012, as Pl. Dep. 18, but the undersigned has been unable to find it in the record. At Plaintiff's deposition, Defendant marked the continued PIP as Exhibit 21. *See* Pl. Dep. 137:16–138:4.

[6] Gartland's declaration is available at ECF No. 16-4.

[7] The 2012 evaluation Defendant submitted appears to be missing pages 5 and 6.

[8] Harrill's affidavits may be found at ECF No. 17-4 and his deposition may be found at ECF No. 17-17.

him a prescription to have a special screen put on his computer because his medications caused trouble with his vision and dry eyes. Pl. Dep. 66:8–18. When Plaintiff gave the prescription to Gartland, he responded "You expect Alion or Kathi Jones to buy this?" *Id*. at 66:23–24. After Plaintiff was provided the screens, Gartland insisted that he did not need them and he took them off. *Id*. at 67:16–68:1. After another employee put the screens back on the computers, Gartland yelled at Plaintiff, who he thought had reinstalled the screens, yanked them off, and took them away. *Id*. at 68:4–15.

In September 2013, Gartland assigned Plaintiff and Harrill to write three monthly histories for the 455th Air Expeditionary Wing ("455 AEW"), a provisional AFCENT unit located at Bagram Airfield in Afghanistan. Gartland Decl. ¶ 9. Gartland advised Jones that the project would be completed in approximately eight weeks. *Id.*

For the first two weeks, Gartland sat between Plaintiff and Harrill to assist them with writing the 455 AEW histories because he knew they had minimal deployment experience and to be available to answer any specific questions they had. *Id.* at ¶ 10. After two to three weeks, Gartland left Plaintiff and Harrill to work in one building, while he worked in another building. *Id.* at ¶ 11. Gartland states he continued to answer questions from both Plaintiff and Harrill via telephone and email. *Id.* Gartland eventually tasked Plaintiff to write about the MC-12 aircraft and Harrill to write about AFCENT's security forces mission. *Id.* Gartland states that he noticed Plaintiff was not making satisfactory progress, so he created screen-by-screen training slides to assist him with writing the histories. *Id.* at ¶ 12.

In October 2013, Plaintiff began to suffer severe and chronic headaches, was weak, sometimes confused, and dizzy. Pl. Aff. ¶¶ 8–10, 15; Pl. Dep. 55:2–8. Plaintiff testified he called for an appointment with Dr. Stewart, but was only able to obtain one two or three weeks out. Pl. Dep. 57:23–58:5. Plaintiff states that around mid-week the week of October 27 to November 1, he recalls he checked his blood sugar and it exceeded 500, the highest he had ever seen. *Id.* at ¶ 8. He shared his concern about his elevated blood sugar with Harrill. *Id.* Harrill told Gartland about Plaintiff's high blood sugar reading, to which Gartland remarked that Plaintiff should see a doctor. Harrill Dep. 27:6–16. During the same week, Plaintiff started the initial edit of his document and noticed strange errors. Pl. Dep. 55:16–21. He told Gartland that he did not understand why the errors were happening, that he was feeling poorly, and experiencing headaches and confusion. Pl. Dep. 55:9–25. Plaintiff told Gartland he was going to his physician and would make the corrections to the draft document. *Id.* Gartland directed Plaintiff to return to other tasks while Gartland himself would make the corrections. *Id.* at 56:1–3.

Plaintiff testified his symptoms had become more severe, such that he called and obtained an earlier appointment with Dr. Stewart for the following Tuesday morning, November 5, 2013. Pl. Aff. ¶¶ 9–11; Pl. Dep. 58:2–15. Plaintiff called in sick the morning of Monday, November 4, 2013, and explained to Gartland that his symptoms had worsened and that he had a doctor's appointment the following day. *Id.* Plaintiff called Gartland the following day, stating he still felt very badly and confirmed the physician appointment for later that morning. Pl. Aff. ¶ 9. Plaintiff testified that later on Tuesday he relayed to Gartland that his doctor had told him, "We're going to have to

adjust your meds, and it's going to take several weeks for us to get this thing adjusted, and, you know, you need to let your employer know that you might need some time off." Pl. Dep. 59:3–7. Plaintiff did not seek any work-related accommodation after he went to see his doctor on Tuesday, November 5. *Id.* at 100:25–101:22.

Meanwhile, Gartland claims that, near the end of October, he discovered serious deficiencies in Plaintiff's work, spent two days evaluating a small portion of Plaintiff's histories and found numerous factual errors, misinterpretations, and confusion. Gartland Decl. ¶ 13. On October 30, 2013, Gartland reported to Waldron via email that he would need to rewrite everything that Plaintiff had written, and that Defendant would not meet the customer's deadline as a result. [ECF No. 16-3 at 25]. The email was forwarded to Cameron and ultimately to its customer, Jones. *Id.* at 22–24. On the morning of November 5, 2013, Jones responded to the email noting Plaintiff's "inability to grasp the current material and to perform satisfactorily," and requested Defendant remove Plaintiff and "replace him with someone who can perform to standards." *Id.* at 21–22].

Defendant submits the email chain [ECF No. 16-3 at 21–26] to demonstrate that by the time Plaintiff called Gartland on Tuesday, November 5, after his appointment with Dr. Stewart, Jones had already sent her email to Cameron asking that Defendant replace Plaintiff. [ECF No. 16-3 at 22; Pl. Dep. 163:12 –165:18]. Defendant subsequently confirmed the termination decision in writing to Plaintiff. [ECF No. 16-3 at 27]. When Plaintiff returned to work on November 6, 2013, Gartland, Waldron, and Cameron met with him to let him know his employment had been terminated "because he had made

mistakes in his writing and they had to go back and were going to have to correct it." Pl. Dep. 53:7–25.

Plaintiff testified he told Gartland on November 6, that his doctor was "writing a letter to explain all this to you guys," but that he could not get the letter until "I think the next day or maybe it was that day." Pl. Dep. 59:11–14. He states that he told Jones: "Well, I've got a letter coming saying this was a medical issue." *Id*. at 61:7–10. Plaintiff ultimately provided a letter dated November 5, 2013, from Dr. Stewart to his counsel, who forwarded it to Defendant. [ECF No. 16-3 at 33–35].[9] Plaintiff acknowledges that Defendant terminated his employment before he received the letter from Dr. Stewart. Pl. Dep. 160:11–14. The letter from Dr. Stewart, which was addressed "To Whom It May Concern," provided:

> Mr. B. Kendall Bell has been a patient of mine since January of 2008. Mr. Bell had fluctuations in his blood sugar, which can affect his work ability and concentration. We are currently working aggressively to fix this medical issue by increasing insulins, referring him to an Endocrinologist; and, having Mr. Bell see a Diabetes Mellitus Educator. This specific medical issue should not occur again.

[ECF No. 16-3 at 34].

In his Complaint, Plaintiff maintains that "… the mental issues causing the errors were/was related to his medical condition …." [ECF No. 1-1 at ¶ 14].

---

[9] Plaintiff's counsel originally sought to send Defendant a copy of the letter from Dr. Stewart on November 11, 2013 ECF No. 16-3 at 30–31, but did not actually do so until November 26, 2013 ECF No. 16-3 at 33–35. *See also* Pl. Dep. 159–65.

II.     Discussion

A.      Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.     Analysis

1.     ADA Claims

Defendant argues that summary judgment should be granted on Plaintiff's ADA claims for failure to accommodate and wrongful discharge.

a.     Failure to Accommodate under the ADA

The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. The Fourth Circuit has held that the causation and burden-shifting standards applicable in Title VII cases as set forth in *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973), are also applicable in cases brought pursuant to the ADA "where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." *Ennis v. Nat'l Assoc. of Bus. and Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995).

Under the analysis set forth in *McDonnell Douglass*, if Plaintiff establishes a prima facie case, then the burden shifts to Defendant to produce a legitimate, non-discriminatory reason for its adverse employment action. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006). If Defendant meets this burden, then "the presumption of discrimination created by the prima facie case 'disappears from the case' and Plaintiff must prove the Defendant's 'proffered justification is pretextual.'" *Id.* at 514 (*quoting Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004)).

To establish a prima facie failure-to-accommodate claim, Plaintiff must allege facts showing: (1) that he was an individual who had a disability within the meaning of the statute; (2) that Defendant had notice of his disability; (3) that with reasonable

accommodation, he could perform the essential functions of the position; and (4) that Defendant refused to make such accommodations. *See Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387, n. 11 (4th Cir. 2001) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2nd Cir. 1999)).

Defendant argues that Plaintiff cannot set forth a prima facie case of failure to accommodate under the ADA because he was not an individual with a disability covered by the statute, and Defendant did not have requisite notice of Plaintiff's alleged disability under the Act.

Defendant first argues that Plaintiff has failed to prove that he has a disability as defined by the ADA under 42 U.S.C. § 12102(1)(A) because he has failed to show that his type-II diabetes substantially limits one or more of his major life activities. The undersigned disagrees. Under the ADA, a "disability" includes: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being "regarded as" having such an impairment. 42 U.S.C. § 12102(1). Plaintiff proceeds under subsections (A) and (C), alleging his diabetes is a disability under the ADA, or alternatively that Defendant regarded him as having an impairment under the ADA.

Plaintiff argues that he was, at the relevant time, a diagnosed, insulin-dependent diabetic and was and is under the continuing care of physician Dr. Stewart. Stewart Aff. ¶ 1; Pl. Aff. ¶¶ 1–2. Plaintiff states that his symptoms during the relevant time period, despite his medications, were neuropathy, impaired vision, confusion, dizziness, and sexual dysfunction. Pl. Aff. ¶ 14. As noted by the Fourth Circuit Court of Appeals,

"diabetes is not a per se disability under the ADA. . . ." *Schneider v. Giant of Maryland, LLC,* 389 F. App'x 263, 268 (4th Cir. 2010).

On September 25, 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), which took effect on January 1, 2009. Pub. L. No. 110–325; 122 Stat. 3553, 3553 (Sept. 25, 2008). The ADAAA expressed congressional concern that case law from the United States Supreme Court had "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect." *Id.* The ADAAA "rejected the standards enunciated" in previous Supreme Court cases and stated that "the definition of disability under the ADA shall be construed in favor of broad coverage of individuals." *Id.*; *see Summers v. Altarum Inst., Corp.,* 740 F.3d 325, 329 (4th Cir. 2014). As the Fourth Circuit Court of Appeals recently stated:

> The ADAAA was intended to make it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The regulation clarifies that "the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *Id.* "The question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." Pub. L. No. 110–325, § 2(b)(5) (2008). In enacting the ADAAA, Congress abrogated earlier inconsistent caselaw. *Summers*, 740 F.3d at 331.

*Jacobs*, 780 F.3d at 572.

The ADAAA defines "major life activities" as:

(A) In general
For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing,

eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions
For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

42 U.S.C. § 12102(2).

Congress enacted several "rules of construction" in the ADAAA, stating as follows:

(1) The definition of disability shall be construed in favor of broad coverage of individuals under this Act;

(2) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADAAA;

(3) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability;

(4) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active; and

(5) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as, *inter alia*, medication and medical supplies.

42 U.S.C. § 12102(4).

Applying the foregoing law to the facts viewed in a light most favorable to Plaintiff, the undersigned finds that a reasonable jury could conclude that Plaintiff is substantially limited by his diabetes in the major life activities of neurological and endocrine functions and thus disabled under the ADA. *See* 42 U.S.C. § 12102(2)(A). Plaintiff has provided evidence showing that his diabetes resulted in at least intermittent

blood sugar spikes that caused confusion and other cognitive issues, severe headaches, neuropathy, impaired vision, and other problems.

Under the ADA, an employer must make "reasonable accommodations" for a disabled employee, unless the employer can demonstrate that the accommodation "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). The law does not require that "the employer go out of his way to provide an accommodation for a disabled employee, but only requires that accommodations are 'reasonable.'" *Schneider v. Giant of Maryland, LLC,* 389 F. App'x 263 (4th Cir. 2010), quoting *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 542 (7th Cir. 1995) ("To 'accommodate' a disability is to make some change that will enable the disabled person to work . . . and at the very least, the cost could not be disproportionate to the benefit.").

Plaintiff has presented no evidence that he requested a reasonable accommodation. The only evidence in the record reflects that Plaintiff was contesting the rationale for his termination. There is no evidence that Plaintiff was denied the opportunity to take time to address his medical conditions. Viewing the evidence in the light most favorable to Plaintiff, the undersigned finds that the fact that Defendant terminated Plaintiff prior to Plaintiff requesting an accommodation does not show that Defendant failed to give Plaintiff a reasonable accommodation for his disability.

Other than letting his supervisor, Gartland, know that he "might need time off to go to the doctor and . . . depending on how he reacted to the meds, he might need a day or two off," Plaintiff concedes he did not seek any work-related accommodation on or after

he went to see his doctor on Tuesday, November 5. Pl. Dep. 100:25–101:22. Plaintiff further admits that he never asked for any specific days off to address his medical condition. *Id*. at 103:13–17. Because Plaintiff never requested an accommodation, Defendant could not have refused his request. Thus, because Plaintiff has failed to make a prima facie case, the undersigned recommends Defendant be granted summary judgment on Plaintiff's claim for failure to accommodate under the ADA.

b.     Wrongful Discharge under the ADA

To establish a prima facie case of wrongful discharge based upon a disability, Plaintiff must show: (1) that he was a qualified individual with a disability; (2) that he was discharged; (3) that he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) that the circumstances of his discharge raise a reasonable inference of unlawful discrimination. *See Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n. 9 (4th Cir. 2004); *Haulbrook v. Michelin N. Am.*, 252 F.3d 696 (4th Cir. 2001).

Defendant argues that Plaintiff cannot set forth a *prima facie* case of wrongful discharge under the ADA because (1) he was not a covered individual with a disability as defined by the ADA, (2) he was not performing the job at a level that met Defendant's legitimate expectations at the time of his discharge, and (3) his discharge did not occur under circumstances that raise any reasonable inference of unlawful discrimination.

Having already found that Plaintiff was a qualified individual with a disability who was discharged, the court must analyze whether he was fulfilling Defendant's

legitimate expectations at the time of his termination and whether the circumstances of his discharge raise a reasonable inference of unlawful discrimination.

Defendant argues that Plaintiff cannot establish that he was meeting its legitimate expectations when its customer, Jones, had made it clear that she was dissatisfied with Plaintiff's performance, had noted Plaintiff's "inability to grasp the current material and to perform satisfactorily," and had requested that Defendant remove Plaintiff and "replace him with someone who can perform to standards." [ECF No. 16-3 at 22].

Plaintiff's performance is evaluated at the time of the alleged adverse action, and courts have recognized that it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff. *King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir. 2003) (Title VII) (plaintiff's own testimony of satisfactory job performance cannot establish a genuine issue as to whether he was meeting his employer's expectations in a race discrimination case) (citing *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960–61 (4th Cir. 1996)). An employer's expectations of its employees are considered "legitimate" when they are honestly held; whether the employee agrees with those expectations is not the test. *Corbell v. City of Holly Hill*, 2014 WL 4722194, at *7 (D.S.C. Sept. 22, 2014) (citing *Thornley v. Penton Pub., Inc.,* 104 F.3d 26, 30 (2d Cir. 1997) ("a plaintiff must satisfy the employer's honestly-held expectations").

Plaintiff has demonstrated that as of several weeks prior to his termination, Defendant felt that Plaintiff was meeting its legitimate expectations. It is not disputed that Defendant performed annual evaluations of Plaintiff every fiscal year, October 1 through September 30. [ECF Nos. 17-6 to 17-10]. Plaintiff received fully satisfactory/exceeds

expectations ratings for 2012. [ECF No. 17-9]. In the most recent evaluation ending September 30, 2013, approximately four to five weeks prior to the termination, Plaintiff again received fully satisfactory/exceeds expectations ratings. [ECF No. 17-10]. Plaintiff testified that during the October 1, 2012–September 30, 2013 evaluation period, he wrote, edited, and submitted over 20 assignments. Pl. Aff. ¶ 21. Plaintiff testified that the following month, October 2013, he only worked on one document upon which an objective evaluation could be made—the unedited draft he brought to Gartland's attention. Pl. Aff. ¶ 15. The evidence shows that the document errors were the reason for his termination, according to Gartland and Jones, as discussed in the email chain. [ECF No. 16-3 at 21–26]. In that email chain, Gartland indicated that he had "discovered serious deficiencies with [Plaintiff's] work," which he found was "full of factual errors, misinterpretations, and confusion." *Id.* at 25. Gartland also stated in the email that if he had known of these issues in completing Plaintiff's evaluation the prior month, "there would have been a big 'needs improvement' on it." *Id.* However, the failure of a performance review to reflect alleged performance issues raised later raise a question of fact by itself regarding the employer's intent. *E.E.O.C. v. Navy Fed. Cred. Union*, 424 F.3d 397, 408 (4th Cir. 2005) (holding plaintiff was found to have rebutted evidence that she was terminated for performance problems when the evidence showed that she had improved the cited problem); *Taylor v. Rite Aid Corp*., 993 F. Supp. 2d 551, 568 (D. Md. 2014) (finding issue of fact precluding summary judgment created by most recent performance review indicating management's satisfaction with employee's progress on prior issues). Viewing the facts and inferences in the light most favorable to Plaintiff, the

undersigned finds that the formal documents on Plaintiff for the 2012 and 2013 evaluation periods suffice to demonstrate satisfactory job performance for the purpose of the prima facie case.

As to the final element, the court evaluates whether Plaintiff's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. The record evidence shows that Defendant based Plaintiff's termination on document errors that Plaintiff specifically showed to Gartland, while concurrently indicating that he planned to correct the errors, and stating that he believed the errors were caused by his medical condition for which he was seeking assistance. Pl. Dep. 55:9–25. Plaintiff was terminated the week after he advised Gartland of his medical issues. The undersigned finds that Plaintiff has sufficiently demonstrated that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination for purposes of the prima facie case.

Under the *McDonald Douglas* burden shifting scheme, once an employee has provided substantial circumstantial evidence for a prima facie case, the burden of production moves to the employer to articulate a non-discriminatory reason for the adverse action. Defendant states that Plaintiff was terminated for "failure to meet Alion's job performance standards." [ECF No. 17-11 at 2].

Defendant having articulated a non-discriminatory reason for the termination decision, Plaintiff must present substantial evidence that Defendant's reason was a pretext for discrimination. Gartland was known to make fun of Plaintiff's disability and refused to allow Plaintiff use a special computer screen to alleviate eye problems caused

by his medications. Harrill Dep. at 52:3–20; Pl Dep. 66:8–68:15.[10] Plaintiff notes that it is undisputed that Gartland had knowledge that Plaintiff had identified his own errors that he believed were caused by his medical condition and that he planned to correct them after he sought medical assistance. Despite this knowledge, Gartland advised his supervisors that he had independently discovered errors in Plaintiff's work and did not convey Plaintiff's belief that his medical condition had caused him to make the errors.

The undersigned finds that a reasonable jury could determine (1) that Gartland only discovered the errors after Plaintiff pointed them out to him in the unedited draft the week of October 27 when Plaintiff's blood sugar exceeded 500; (2) that Gartland knew Plaintiff's blood sugar reading was high; (3) that Plaintiff told Gartland he was feeling poorly and experiencing headaches and confusion; (4) that Gartland knew that Plaintiff was going to his physician; (5) that Plaintiff might need some time off to address his medical issues; and (6) that Gartland did not reveal in his email any of the foregoing facts to Jones or his supervisors. Gartland's initiation of the discharge discussion occurred the precise week that Plaintiff informed him of his health issues and the need to address them with his physician. A reasonable jury could determine that Defendant's proffered reason for termination is not credible and is more likely a result of ADA discrimination. This is

---

[10] Defendant argues that any allegations of discriminatory conduct occurring prior to February 14, 2013, are outside the scope of Plaintiff's charge and may not be considered. [ECF No. 19 at 13]. While the undersigned agrees that Plaintiff is limited to the *claims* presented in the administrative charge, Plaintiff is not asserting an independent claim based on these allegations. Just as the court may consider evidence of Plaintiff's PIP prior to February 14, 2013, the court may consider evidence that Gartland had demonstrated a bias against Plaintiff because of his disability during the same time frame if it is relevant to Plaintiff's properly-exhausted claims.

especially true considering Defendant has not demonstrated that these kinds of errors had occurred in Plaintiff's prior writings. Therefore, the undersigned recommends the court deny Defendant's motion for summary judgment on Plaintiff's wrongful discharge claim under the ADA.

### 2. FMLA Claims

#### a. Interference Claim

Defendant argues that it did not interfere with Plaintiff in violation of the FMLA. Defendant argues that Plaintiff never requested, or took, FMLA leave related to his diabetes, such that his FMLA claim should be dismissed.

To set forth an interference claim under the FMLA, an employee must demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm. *Adams,* 789 F.3d at 427. Plaintiff admits that he did not seek intermittent FMLA leave related to treatment for his diabetes. *Id*. at 78:21–23; 84:4–9. During his employment with Defendant, Plaintiff requested and received leaves of absences for shoulder surgery in 2009 and knee surgery in 2012. *Id*.; *see also* ECF No. 16-3 at 4–9. Defendant granted Plaintiff FMLA leave in both instances. *Id.*

Plaintiff's FMLA interference claim fails because Plaintiff has cited no evidence that Defendant interfered with, denied, or restrained his FMLA rights.  Further, Plaintiff never sought FMLA from Defendant for his diabetes, even though he had sought and obtained FMLA leave for other medical conditions at least twice before.

Accordingly, Plaintiff has failed to demonstrate any genuine issue for trial that Defendant interfered with the provision of any FMLA leave benefit. Therefore, the undersigned recommends that Defendant be granted summary judgment on Plaintiff's FMLA interference claim.

### b. Retaliation Claim

To the extent that Plaintiff's Complaint may be read to allege Defendant retaliated against him for taking FMLA leave pursuant to 29 U.S.C. § 2615(a)(2), Plaintiff has presented no argument of retaliation in violation of the FMLA. The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action." *Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp. 2d 540, 560–61 (D.S.C. 2009). The undersigned recommends that, to the extent that Plaintiff intended to bring a retaliation claim under the FMLA, Plaintiff has abandoned such claim.

### 3. Breach of Contract Claim

Plaintiff also alleged a claim for breach of contract in his Complaint. Defendant argues that Plaintiff was an at-will employee, and he has failed to set forth any facts or evidence that would support an implied contract of employment. In his response, Plaintiff makes no argument regarding his breach of contract claim, and the undersigned recommends it be dismissed with prejudice as abandoned by Plaintiff. *Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp. 2d 540, 560–61 (D.S.C. 2009).

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment [ECF No. 16] be granted as to Plaintiff's breach of contract, FMLA, and failure-to-accommodate ADA claims and denied as to Plaintiff's wrongful discharge ADA claim.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 1, 2017                                    Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).